J-A05037-18

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| IN THE INTEREST OF: Z.V.G., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| APPEAL OF: D.G., FATHER | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 2578 EDA 2017 |

Appeal from the Order Entered July 18, 2017
in the Court of Common Pleas of Philadelphia County Family Court at
No(s): CP-51-AP-0000329-2017,
CP-51-DP-0000686-2015

| | | |
|---|---|---|
| IN THE INTEREST OF: G.L.G., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| APPEAL OF: D.G., FATHER | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 2580 EDA 2017 |

Appeal from the Order Entered July 18, 2017
in the Court of Common Pleas of Philadelphia County Family Court at
No(s): CP-51-AP-0000330-2017,
CP-51-DP-0000687-2015

BEFORE:   DUBOW, J., MURRAY, J., and STEVENS, P.J.E.*

MEMORANDUM BY STEVENS, P.J.E.:                    **FILED APRIL 02, 2018**

Appellant, D.G. ("Father"), files these consolidated appeals from the

orders entered on July 18, 2017, in the Philadelphia County Court of Common

Pleas, granting the petition of the Department of Human Services ("DHS") and

involuntarily terminating his parental rights to his minor, dependent children,

Z.V.G., a female born in April of 2011, and G.L.G., a male born in October of

_____

* Former Justice specially assigned to the Superior Court.

2012 (collectively, the "Children"), pursuant to the Adoption Act, 23 Pa.C.S.A. § 2511(a)(1), (2), and (b).[1]  Father further appeals from the orders entered July 18, 2017 changing the Children's permanency goals to adoption pursuant to the Juvenile Act, 42 Pa.C.S.A. § 6351.[2]  In addition, on December 3, 2017, counsel for Father filed an **Anders**[3] brief, averring the within appeal is frivolous, as well as a petition to withdraw.  After review, we grant counsel's petition to withdraw and affirm the trial court's termination orders.

The trial court summarized the relevant procedural and factual history, in part, as follows:

> On March 17, 2015, the Department of Human Services (DHS) received a Child Protective Services (CPS) Report alleging that [G.L.G.] went to school with a fist-shaped bruise on his left cheek, temple, and forehead area; that Mother[]'s, paramour, A.C., had hit the [c]hild; that [Z.V.G.] had suffered a four-inch untreated cut on the palm of her right hand when A.C.[] kicked her down the steps; that both of these injuries occurred over the weekend of March 14-15, 2015; that it was unknown if Mother was present at the time of the incidents; that there were 6-7 previous injuries that were documented for G.L.G.; that on November 19, 2014. G.L.G.[] had an unexplained bruise on his

---

[1] By separate orders entered October 3, 2017, the trial court voluntarily terminated the parental rights of the Children's mother, V.C. ("Mother"). Mother has not filed an appeal and is not a party to the instant appeal.

[2] Our review of the record reveals that no goal change took place until October 3, 2017.  Critically, the court did not indicate at the conclusion of the termination/goal change hearing that it would be changing the Children's goal, and the court's July 18, 2017 permanency review orders maintained the Children's goal as return to parent or guardian.  Accordingly, we address only the termination of Father's parental rights.

[3] **Anders v. California**, 386 U.S. 738 (1967).

face and Mother stated that the [c]hild had hit himself in the face with a nunchuck; that on February 9, 2015, G.L.G.[] had a green, purple and red bruise on his face and Mother stated that it was the result of the [c]hild falling over the weekend; that on February 13, 2015, G.L.G.[] had a bruise on his left eye and head, and Mother stated it had occurred when [G.L.G.] and his sister were fighting with each other; that on February 19, 2015, G.L.G.[] had scratches on his face; and that on February 20, 2015, G.L.G.[] had diaper rash. The [r]eport further alleged that A.C.[] appeared intoxicated one day when he visited the Children's daycare: that A.C.[] suffered from substance use; and [] Mother was employed. A.C.[] is the [f]ather of Mother's other [c]hild, S.C. The [r]eport was determined as valid. (Exhibit "A" Statement of Facts, attached to DHS Petition for Involuntary Termination of Parental Rights, filed 3/15/2017, ¶ "a").

On March 17, 2015, DHS contacted Mother and she denied the allegations of the CPS Report. (Exhibit "A" Statement of Facts, attached to DHS Petition for Involuntary Termination of Parental Rights, filed 3/15/2017, ¶ "b").

On March 18, 2015, DHS visited Mother's three [c]hildren at their daycare. DHS learned that Z.V.G. and G.L.G.[] began attending the daycare on October 22, 2014, and the other [c]hild, S.C., began attending on February 13, 2015; that there were eight incidents of injuries in the past regarding G.L.G.[,] and one incident regarding Z.V.G.; that A.C.[] arrived at the daycare intoxicated on several occasions to retrieve the Children, most recently on 3/13/2015; that Mother arrived moments later, and that A.C.[] yelled at Mother and Mother hurried away from the daycare with her [c]hildren; that G.L.G.[] was observed to run away from A.C.[] in fear; and that S.C.[] had a rash on both of her cheeks but Mother did not provide the daycare with any medication. (Exhibit "A" Statement of Facts, attached to DHS Petition for Involuntary Termination of Parental Rights, filed 3/15/2017, ¶ "c").

On March 18, 2015, DHS spoke to Z.V.G.[] and she stated that A.C.[] had recently pushed her down the steps and had burned her hand on the stove in the past. She stated that both incidents happened in Mother's presence. The [c]hild also stated that A.C.[] had punched G.L.G.[] in the face and hit S.C. when she did not stop crying. The [c]hild stated that she was fearful of A.C. DHS observed that G.L.G.[] had a fading bruise on the left side of his face and 5-6 scratches on the right side of his face.

(Exhibit "A" Statement of Facts, attached to DHS Petition for Involuntary Termination of Parental Rights, filed 3/15/2017, ¶ "d").

DHS had also received allegations of domestic violence between Mother and A.C., and that Mother also hit Z.V.G. and G.L.G. (Exhibit "A" Statement of Facts, attached to DHS Petition for Involuntary Termination of Parental Rights, filed 3/15/2017, "e").

On March 18, 2015, DHS contacted Z.V.G. and G.L.G.'s Father, D.W.G., Jr., by telephone. Father indicated that he worked at night and that he would be moving in two weeks to reside with his paramour, who could care for the Children while he worked. Father stated that he was in New Jersey at the time of the call and that he was unable to retrieve the Children. Father admitted that he had seen the gash on Z.V.G.'s right hand on 3/15/2015 and that G.L.G.[] had not had any marks on his face when he saw him that day. Father further stated that Mother told him that Z.V.G.[] had exaggerated about the incident. (Exhibit "A" Statement of Facts, attached to DHS Petition for Involuntary Termination of Parental Rights, filed 3/15/2017, ¶ "f").

On March 18, 2015, DHS met with Mother, who initially denied that A.C.[] was abusive to the Children, but subsequently stated that she would tell A.C.[] not to hit her [c]hildren anymore. Mother admitted that there was domestic violence between herself and A.C., who resided with Mother. Mother identified the Children's [m]aternal [g]randmother, V.C., as a possible caregiver. (Exhibit "A" Statement of Facts, attached to DHS Petition for Involuntary Termination of Parental Rights, filed 3/15/2017, ¶ "g").

On March 18, 2015, DHS obtained an Order of Protective Custody (OPC) for the Children, and they were placed in the care of V.C., Maternal Grandmother. The Children were also taken to St. Christopher's Hospital to be evaluated. It was determined S.C.[] had a bad cold and was prescribed medication; that G.L.G.[] had old marks on both sides of his back, and that Z.V.G.[] had swelling above her left eye. (Exhibit "A" Statement of Facts, attached to DHS Petition for Involuntary Termination of Parental Rights, filed 3/15/2017, ¶ "h").

On March 18, 2015, Community Umbrella Agency (CUA), Turning Points for Children (TP4C), implemented in-home services for this family. (Exhibit "A" Statement of Facts, attached to DHS

Petition for Involuntary Termination of Parental Rights, filed 3/15/2017, ¶ "i").

A Shelter Care Hearing was held on March 20, 2015, for both [c]hildren, before Juvenile Court Hearing Officer, William T. Rice. The [c]ourt issued an Order lifting the OPC, and the legal custody of the Children was transferred to DHS. Placement of the Children to remain in [f]oster [c]are. DHS to do home evaluation on the parent's home [sic]. Mother is to have supervised line[-]of[-]sight visits with the Children, and Father, D.W.G., Jr., is to have weekly supervised visits with his [c]hildren. Children are safe as of 3/18/2015. (Shelter Care Orders, 3/20/2015).

On March 24, 2015. DHS received a CPS Report which alleged that A.C.[] had sexually abused Z.V.G.[] on multiple occasions; that A.C.[] may have threatened to kill the [c]hild if she disclosed the sexual abuse; that blood had been observed in both the [c]hildren's beds; that Mother was aware of the blood in her [c]hildren's beds and had stated that the blood had come from the Children's nose bleeds; however, it was noted that the amount of blood was significant. The [r]eport also alleged that A.C.[] was physically abusive towards the Children; that DHS had removed the Children from Mother's care; that the Children were presently residing with their [m]aternal [g]randmother; that it was suspected that A.C.[] continued to live in Mother's home; however, Mother denied that A.C.[] lived with her; that A.C.[] used drugs; that domestic violence existed between Mother and A.C.; and that the domestic violence had been witnessed by the Children. The [r]eport further alleged that Mother was employed; that Mother worked long hours and often left the Children in the care of A.C.; that it was apparent that Mother loved her [c]hildren; however, that Mother was in denial regarding the abuse committed by A.C.[] towards her [c]hildren. The [r]eport was determined as valid. (Exhibit "A" Statement of Facts, attached to DHS Petition for Involuntary Termination of Parental Rights, filed 3/15/2017, ¶ "l").

A hearing was held on April 9, 2015, and [a]djudication was deferred on both [c]hildren. Children reside with Maternal Grandmother in [k]inship [c]are. Father resides [in] Levittown, PA, 19057, and is referred to CEU [Clinical Evaluation Unit] for substance assessment to include alcohol-forthwith screen and monitoring. DHS to conduct a forthwith home assessment of Father's home, and all occupants over the age of 14 years. Temporary [c]ommitment [s]tands. Mother's visits are to remain

line-of-sight supervised visits. Both [c]hildren were safe as of 3/21/2015. (Continuance Orders, 4/09/2015).

Adjudicatory Hearings were held for both [c]hildren on April 23, 2015, before the Honorable Allan L. Tereshko. Legal Custody of the Children remains with DHS, and placement of the Children remains in [k]inship [c]are. Both [c]hildren [a]djudicated [d]ependent. Mother to continue line-of-sight visits supervised at the Agency. Father may have unsupervised visits in the community, which may be further modified by agreement of the parties. Father is not to take Children to visit Mother. CUA to follow up with all residents in Father's home forthwith. Children[] safe as of 4/15/2015. (Orders of Adjudication and Disposition-Child Dependent, 4/23/2015).

On June 18, 2015, CUA-TP4C held a Single Case Plan (SCP) Meeting. The parental objectives for Father were to: 1) attend ARC program; 2) participate in parenting classes; and 3) call to confirm his visits with Z.V.G. and G.L.G. Father participated in the SCP Meeting. (Exhibit "A" Statement of Facts, attached to DHS Petition for Involuntary Termination of Parental Rights, filed 3/15/2017, ¶ "o").

. . .

On December 29, 2015, CUA-TP4C held a revised SCP Meeting. The parental objectives established for Father were to: 1) maintain his relationship with his [c]hildren; 2) explore regular unsupervised visits with his [c]hildren; and 3) obtain a copy of his discharge plan from NOVA. Mother and Father participated in the SCP Meeting. (Exhibit "A" Statement of Facts, attached to DHS Petition for Involuntary Termination of Parental Rights, filed 3/15/2017, ¶ "v").

. . .

On July 29, 2016, DHS received a CPS Report which alleged that A.C.[] had sexually abused the three [c]hildren on an on-going basis; that S.C.[] had been parroting G.L.G., and was stating that "dad hit me[,"] and that A.C.[] was awaiting trial for sexual and physical abuse of the Children. The [r]eport alleged that S.C.[] is currently one-year–old [sic] and is starting to verbalize words; that Z.V.G.[] had disclosed the sexual abuse to the Children's [m]aternal [g]randmother and [m]aternal [a]unt; and that the Children resided with their [m]aternal [g]randmother. The [r]eport also alleged that the Children had

been in the care of Mother and A.C.[] when the incidents of sexual and physical abuse occurred; that there had been [r]eports of domestic abuse between Mother and A.C., which were documented via Protection from Abuse (PFA) orders in Domestic Relations Court; and that Mother received mental health therapy. The [r]eport further alleged that Z.V.G.[] and G.L.G.[] received weekly trauma-focused therapy due to the sexual and physical abuse; that S.C.[] also accompanied her siblings to their therapy sessions; that the Children's [m]aternal [g]randmother had completed the necessary training through the Children's Foster Care Agency; and that the Children's [m]aternal [g]randmother had professional staff in and out of her home on a bi-weekly basis to address all of the Children's needs.  It was alleged that Mother remained in denial regarding the seriousness of her [c]hildren's sexual and physical abuse; and that Mother lacked an understanding as to her [c]hildren's behavior and trauma, as well as her role in the abuse suffered by her [c]hildren.  The [r]eport was determined as valid.  (Exhibit "A" Statement of Facts, attached to DHS Petition for Involuntary Termination of Parental Rights, filed 3/15/2017, ¶ "bb").

. . .

On November 30, 2016, Father underwent a Parenting Capacity Evaluation (PCE) at Forensic Mental Health Services, LLC. Recommendations for Father included: 1) enroll in individual therapy to develop an understanding of how to anticipate and plan for his [c]hildren's needs; 2) participate in caregiver sessions as requested and begin to develop an understanding of the impact of the trauma his [c]hildren experienced; and 3) re-evaluation be conducted if Father demonstrates consistent attendance in the aforementioned treatment and caregiver sessions for at least six months. (Exhibit "A" Statement of Facts, attached to DHS Petition for Involuntary Termination of Parental Rights, filed 3/15/2017, ¶ "ff").

Trial Court Opinion ("T.C.O."), 10/20/17, at 2-13.

The trial court held permanency review hearings in this matter on July 2, 2015, September 2, 2015, November 16, 2015, February 18, 2016, April 12, 2016, May 16, 2016, July 12, 2016, August 9, 2016, September 14, 2016, and December 1, 2016.  **See** Dependency dockets.  Throughout these reviews,

the trial court maintained the Children's commitment and placement, and permanency goal. *Id.*

DHS filed petitions to terminate parental rights and to change the Children's permanency goal on March 15, 2017. The trial court held a combined termination/goal change hearing on July 18, 2017. At the hearing, DHS presented the testimony of the following: Michael Flanagan, Community Umbrella Agency ("CUA") case manager, Turning Points for Children; Feebee Southerland, Children's Crisis Treatment Center ("CCTC") trauma therapist, who was treating Z.V.G.; Angel Winand, CCTC trauma therapist, who was treating G.L.G.; and Dr. Erica Williams, licensed psychologist, who conducted a parenting capacity evaluation of Father.[4] DHS also presented Exhibits 1 through 12, which were marked and admitted without objection. Notes of Testimony, 7/18/17, at 8-11. Additionally, Father testified on his own behalf. Both a court-appointed guardian *ad litem* and child advocate participated in the proceedings. By orders entered July 18, 2017, the trial court involuntarily terminated the parental rights of Father pursuant to 23 Pa.C.S.A. § 2511(a)(1), (2), and (b).[5]

_____

[4] Dr. Williams was stipulated as an expert. N.T. at 66. She authored a report, dated November 30, 2016, with Lauren Rosenthal, M.S., marked and admitted as Exhibit 11.

[5] These orders memorialized the decision placed by the court on the record at the conclusion of the hearing. N.T. at 95-97.

On August 7, 2017, Father, through appointed counsel, filed notices of appeal, along with concise statements of errors complained of on appeal pursuant to Pa.R.A.P. 1925(a)(2)(i) and (b), which this Court consolidated *sua sponte* on October 12, 2017. Counsel filed an **Anders** brief, as well as a petition to withdraw, on December 3, 2017.[6]

On appeal, counsel's **Anders** brief raises the following issue for our review:

> Whether there was a legal basis for terminating Father's parental rights pursuant to 23 Pa.C.S.A. [§] 2511(a)(1), (2), (5), (8), and (b) [and] to change [the Children's permanency] goal from reunification to adoption[?]

**Anders** Brief at 6 (unnecessary capitalization omitted).[7]

When counsel files an **Anders** brief, this Court may not review the merits of the appeal without first addressing counsel's request to withdraw. **Commonwealth v. Washington**, 63 A.3d 797, 800 (Pa.Super. 2013); **see also Commonwealth v. Rojas**, 874 A.2d 638, 639 (Pa.Super. 2005) (stating, "When faced with a purported **Anders** brief, this Court may not review the merits of the underlying issues without first passing on the request

---

[6] The Guardian *ad litem* filed a letter of no response to Counsel's **Anders** brief indicating a belief that Father's appeal is without merit. **See** Letter of No Response, 12/27/17. The Child Advocate did not submit a brief or letter.

[7] We observe that, in his **Anders** brief, Counsel stated the issues on appeal somewhat differently from the Rule 1925(b) Statement filed with the notice of appeal. We, nevertheless, find that Counsel has preserved challenges to the trial court's termination of his parental rights pursuant to Sections 2511(a)(1), (2), and (b). While Counsel additionally references subsections (a)(5) and (a)(8), the trial court did not terminate Father's parental rights pursuant to these subsections.

to withdraw[]") (citation omitted).  In *In re V.E. & J.E.*, 611 A.2d 1267 (Pa.Super. 1992), this Court extended the *Anders* principles to appeals involving the termination of parental rights.  *Id*. at 1275.  Counsel appointed to represent an indigent parent on appeal from an order involuntarily terminating parental rights may therefore petition this Court for leave to withdraw representation and submit an *Anders* brief.  *In re S.M.B.*, *A.M.B., & G.G.B.*, 856 A.2d 1235, 1237 (Pa.Super. 2004).

To withdraw, pursuant to *Commonwealth v. Millisock*, 873 A.2d 748 (Pa.Super. 2005) and its progeny, counsel must:

> 1) petition the court for leave to withdraw stating that, after making a conscientious examination of the record, counsel has determined that the appeal would be frivolous; 2) furnish a copy of the [*Anders*] brief to the [appellant]; and 3) advise the [appellant] that he or she has the right to retain private counsel or raise additional arguments that the [appellant] deems worthy of the court's attention.

*Commonwealth v. Cartrette*, 83 A.3d 1030, 1032 (Pa.Super. 2013) (*en banc*) (citing *Commonwealth v. Lilley*, 978 A.2d 995, 997 (Pa.Super. 2009)); *see also Commonwealth v. Orellana*, 86 A.3d 877, 880 (Pa. Super. 2014).  We further review counsel's *Anders* brief for compliance with the requirements set forth in *Commonwealth v. Santiago*, 602 Pa. 159, 978 A.2d 349 (2009):

> [W]e hold that in the *Anders* brief that accompanies court-appointed counsel's petition to withdraw, counsel must: (1) provide a summary of the procedural history and facts, with citations to the record; (2) refer to anything in the record that counsel believes arguably supports the appeal; (3) set forth counsel's conclusion that the appeal is frivolous; and (4) state

counsel's reasons for concluding that the appeal is frivolous. Counsel should articulate the relevant facts of record, controlling case law, and/or statutes on point that have led to the conclusion that the appeal is frivolous.

602 Pa. at 178-79, 978 A.2d at 361.

Counsel has satisfied the first requirement of **Anders** by filing a petition to withdraw, wherein he asserts that he has made a conscientious review of the record and determined the appeal would be frivolous.[8]  Likewise, counsel has satisfied the second requirement by filing an **Anders** brief that complies with the requirements set forth in **Santiago**, **supra**.  With respect to the third requirement, counsel has attached to the petition to withdraw a copy of the letter sent to Father advising him of his rights, and enclosing a copy of the **Anders** brief.  Hence, we conclude that counsel has complied with the procedural **Anders** requirements.  We, therefore, turn to the issue presented in the **Anders** brief to make an independent judgment as to whether the appeal is, in fact, wholly frivolous.  **Commonwealth v. Bynum-Hamilton**, 135 A.3d 179 (Pa.Super. 2016).

In matters involving involuntary termination of parental rights, our standard of review is as follows:

_____

[8] Although Counsel does not directly state in his petition that, after making a conscientious examination of the record, he has determined that the appeal is frivolous, counsel does indicate he is filing an **Anders** brief and references **Santiago**, **supra**.  Further, in the **Anders** brief, which counsel forwarded to Father, along with the petition, counsel asserts that he has made a conscientious examination of the record and determined the appeal is frivolous.  **Anders** Brief at 9, 17.  We, therefore, find this requirement satisfied.

The standard of review in termination of parental rights cases requires appellate courts "to accept the findings of fact and credibility determinations of the trial court if they are supported by the record." *In re Adoption of S.P.*, [616 Pa. 309, 325, 47 A.3d 817, 826 (2012)]. "If the factual findings are supported, appellate courts review to determine if the trial court made an error of law or abused its discretion." *Id.* "[A] decision may be reversed for an abuse of discretion only upon demonstration of manifest unreasonableness, partiality, prejudice, bias, or ill-will." *Id.* The trial court's decision, however, should not be reversed merely because the record would support a different result. *Id.* at [325-26, 47 A.3d at] 827. We have previously emphasized our deference to trial courts that often have first-hand observations of the parties spanning multiple hearings. *See In re R.J.T.*, [608 Pa. 9, 26-27, 9 A.3d 1179, 1190 (2010)].

*In re T.S.M.*, 620 Pa. 602, 628, 71 A.3d 251, 267 (2013). "The trial court is free to believe all, part, or none of the evidence presented and is likewise free to make all credibility determinations and resolve conflicts in the evidence." *In re M.G. & J.G.*, 855 A.2d 68, 73-74 (Pa.Super. 2004) (citation omitted). "[I]f competent evidence supports the trial court's findings, we will affirm even if the record could also support the opposite result." *In re Adoption of T.B.B.*, 835 A.2d 387, 394 (Pa.Super. 2003) (citation omitted).

The termination of parental rights is governed by Section 2511 of the Adoption Act, 23 Pa.C.S.A. §§ 2101-2938, and requires a bifurcated analysis of the grounds for termination followed by the needs and welfare of the child.

Our case law has made clear that under Section 2511, the court must engage in a bifurcated process prior to terminating parental rights. Initially, the focus is on the conduct of the parent. The party seeking termination must prove by clear and convincing evidence that the parent's conduct satisfies the statutory grounds for termination delineated in Section 2511(a). Only if the court determines that the parent's conduct warrants termination of his or her parental rights does the court engage in the second part of the analysis pursuant to Section 2511(b): determination of the

needs and welfare of the child under the standard of best interests of the child. One major aspect of the needs and welfare analysis concerns the nature and status of the emotional bond between parent and child, with close attention paid to the effect on the child of permanently severing any such bond.

*In re L.M.*, 923 A.2d 505, 511 (Pa.Super. 2007) (citations omitted). We have defined clear and convincing evidence as that which is so "clear, direct, weighty and convincing as to enable the trier of fact to come to a clear conviction, without hesitance, of the truth of the precise facts in issue." *In re C.S.*, 761 A.2d 1197, 1201 (Pa.Super. 2000) (*en banc*) (quoting *Matter of Adoption of Charles E.D.M., II*, 550 Pa. 595, 601, 708 A.2d 88, 91 (1998)).

In the case *sub judice*, the trial court terminated Father's parental rights pursuant to 23 Pa.C.S.A. § 2511(a)(1), (2), and (b). We have long held that, in order to affirm a termination of parental rights, we need only agree with the trial court as to any one subsection of Section 2511(a), as well as Section 2511(b). *See In re B.L.W.*, 843 A.2d 380, 384 (Pa.Super. 2004) (*en banc*). Here, we analyze the court's termination orders pursuant to subsections 2511(a)(2) and (b), which provide as follows:

> **(a) General rule.--**The rights of a parent in regard to a child may be terminated after a petition filed on any of the following grounds:
>
> . . .
>
> (2) The repeated and continued incapacity, abuse, neglect or refusal of the parent has caused the child to be without essential parental care, control or subsistence necessary for his physical or mental well-being and the conditions and causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied by the parent.

- 13 -

. . .

>**(b) Other considerations.--**The court in terminating the rights of a parent shall give primary consideration to the developmental, physical and emotional needs and welfare of the child. The rights of a parent shall not be terminated solely on the basis of environmental factors such as inadequate housing, furnishings, income, clothing and medical care if found to be beyond the control of the parent. With respect to any petition filed pursuant to subsection (a)(1), (6) or (8), the court shall not consider any efforts by the parent to remedy the conditions described therein which are first initiated subsequent to the giving of notice of the filing of the petition.

23 Pa.C.S.A. § 2511(a)(2), and (b).

We first address whether the trial court abused its discretion by terminating Father's parental rights pursuant to Section 2511(a)(2).

>In order to terminate parental rights pursuant to 23 Pa.C.S.A. § 2511(a)(2), the following three elements must be met: (1) repeated and continued incapacity, abuse, neglect or refusal; (2) such incapacity, abuse, neglect or refusal has caused the child to be without essential parental care, control or subsistence necessary for his physical or mental well-being; and (3) the causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied.

*In re Adoption of M.E.P.*, 825 A.2d 1266, 1272 (Pa.Super. 2003) (citation omitted). "The grounds for termination due to parental incapacity that cannot be remedied are not limited to affirmative misconduct. To the contrary, those grounds may include acts of refusal as well as incapacity to perform parental duties." *In re Adoption of C.D.R.*, 111 A.3d 1212, 1216 (Pa.Super. 2015) (quoting *In re A.L.D.*, 797 A.2d 326, 337 (Pa.Super. 2002)). "Parents are required to make diligent efforts towards the reasonably prompt assumption of full parental responsibilities. . . . [A] parent's vow to cooperate, after a

long period of uncooperativeness regarding the necessity or availability of services, may properly be rejected as untimely or disingenuous." ***In re A.L.D.***, 797 A.2d at 340 (internal quotation marks and citations omitted).

In the case at bar, in finding grounds for termination pursuant to Section 2511(a)(2), as well as Section 2511(a)(1), the trial court reasoned as follows:

> This [c]ourt heard credible evidence regarding Father's failure to perform parental duties, and inability to remedy the conditions which led to the Children's removal and placement. Case manager, Michael Flanagan, CUA Case Manager for Turning Points for Children testified the Children were not placed with their Father at the beginning because he told the DHS investigator that he was in New Jersey helping someone move at the time and could not take his [c]hildren. He stated the SCP objectives for Father were to attend mental health therapy, attend parenting classes, attend regular visits with the Children, and finally to comply with the recommendations from the PCE. He stated[,] although the Children were not living with Father at the time of removal, [Father] needed to attend mental health therapy because of the abuse his [c]hildren had suffered and their need for therapy. Early reports stated that Father was aware of the physical abuse, but he did not report it or take his [c]hildren out of Mother's care at the time. Mr. Flanagan engaged in conversations with Father and [Father] admitted that he had seen evidence of physical abuse, and stated he did not want A.C. to care for his [c]hildren. However, he never took steps to ensure that A.C. was not in a caregiving capacity.
>
> Mr. Flanagan also provided credible testimony that Father did attend mental health therapy, first at NOVA, where he did not attend consistently, and then at Behavioral Counseling Services, which he began on March 23, 2017. Father was also referred to Family School for parenting classes. Father attended as ordered. Regarding visitation, Mr. Flanagan testified Father began with supervised visits[,] which were later changed to unsupervised. However, the visits were returned to supervised after an incident where Z.V.G.[] told the therapist that[,] during a visit with Father at Burger King, people were there who she did not know and an unknown female escorted her to the bathroom. Since then, visits have been supervised and Father has attended consistently.

Finally, he testified Father attended a Parenting Capacity Evaluation, and participated in caregiver sessions with the Children. However, he does not believe Father understands the specifics of the abuse and what his role is as a protective caregiver.

Dr. Erica Williams testified as an [e]xpert and provided credible, persuasive testimony regarding Father. She conducted a Parenting Capacity Evaluation on Father in November of 2016, and conducted a [c]linical [i]nterview. She testified that based on the information presented to her regarding providing safety and her [i]nterview with him, Father was not able to affect his [c]hildren's safety. He had limited knowledge or[,] if he did have knowledge, he did not follow through. And then[,] there were multiple areas that without coaching he simply didn't understand. It is her understanding that these things continue to be an issue even beyond being coached. So even with that immediate help, Father is not able to do these things, and is not able to provide that daily safety or that larger safety or even to the intent [sic] to care for the Children.

Further, she noted that Father reports having other [c]hildren in his care as well, and another [c]hild who was kidnapped by the [m]other and he has not investigated or been motivated to find out where his [c]hild is. So, although Father speaks about sometime providing care for Z.V.G.[] and G.L.G.[,] he cannot provide a cohesive understanding of what that entails. There is an inconsistent understanding of who is in his care, or what adults are present. So[,] it is that larger pattern of transient people, transient responsibilities and the safety of the Children being impacted because of it.

Finally, Dr. Williams opined that[,] although Father attended caregiver sessions and meetings[,] and despite the intervention, despite time, despite explanation and the variety of recommendations to help him get to a place where he is able to understand it and work towards the Children's safety, there is no progression by Father. She stated that[,] despite the thirteen sessions for Father, there is truly no progression. She stated that Father presents without being able to provide safety and permanency for his [c]hildren.

Father, on the other hand, provided testimony that was not persuasive and found to be incredible by this [c]ourt. Therefore, this [c]ourt reasoned the evidence is clear and convincing that[,]

although Father may have appeared to have accomplished some of the goals set forth, none of it has resulted in any enhanced stability to recognize what his [c]hildren have been subjected to, and what their needs are. This [c]ourt is not persuaded that Father can or will remedy the conditions which brought the Children into [c]ourt supervision. Nor is the [c]ourt persuaded that Father will be able to fulfill his parental responsibilities in the future. Based on the evidence presented, this [c]ourt found clear and convincing evidence to terminate Father's parental rights pursuant to 23 Pa.C.S.A. [§] 2511(a)(1) and (2).

T.C.O. at 24-27.

A review of the record supports the trial court's finding of grounds for termination under Section 2511(a)(2). The record reveals that, despite completion of some his SCP objectives, Father failed to take responsibility for and appreciate the reasons the Children came into care and his role related thereto and lacked a protective capacity. As we discern no abuse of discretion or error of law, we do not disturb the court's findings.

CUA case manager, Michael Flanagan, testified that the Children came into care due to "alleged sexual and physical abuse."[9] N.T. at 15, 17. Mr. Flanagan expressed that Father was not able to understand the Children's abuse. He stated, "I don't believe he understands like the specifics of it and what his role was in it. In the abuse itself really as a protective caregiver [sic]." *Id*. at 32.

Mr. Flanagan also expressed concerns related to stability. He noted that, since his involvement in the case, Father has had four different fiancées and two different homes, and his plan is for whoever his fiancée is at the time

---

[9] Mr. Flanagan further confirmed that such allegations were later founded and resulted in criminal charges. N.T. at 17-18.

to be the Children's caregiver. *Id*. at 33. Mr. Flanagan stated, "The caregiver would need to be stable and they would need to understand the past abuse and the therapy that they're going through now because these are vulnerable kids." *Id*. at 33-34.

Related to the Children's abuse, Z.V.G.'s trauma therapist, Feebee Southerland, reported that Father "acknowledge[d] that [Z.V.G.] was hurt," but "does not seem to have an appreciation of the extent to which [the Children] were victimized, more traumatized." *Id*. at 53. In discussing the caregiver therapy sessions,[10] she further stated, "[Father] did not present a full understanding to the extent in which his children were abused, sexually abused and physically abused." *Id*. at 60. Father never admitted during sessions that he was aware of the Children's abuse, or recognized that he could have done things differently. *Id*. at 53, 61.

> Additionally, when we would talk to [Father] about where he was when this happened, when DHS called, when they were being removed from mom, you know, [Father] stated that he was in New Jersey and was unable to get here. And that was something that never changed. And not once was [Father] able to provide a, you know, "In retrospect I would have done this differently," type of response. It was – it stayed along the line of, "That's what happened. There was nothing I could have done differently."

*Id*. at 60-61.

---

[10] Ms. Southerland explained the goal of these sessions is "[f]or parents to acknowledge, to be able to fully acknowledge and appreciate the extent of their child's experiences." N.T. at 51. Father participated in thirteen caregiver sessions. *Id*. at 52.

Moreover, Dr. Williams offered an opinion that Father is unable to provide for the Children's safety and permanency. *Id*. at 75. She confirmed that Father is "not able to accomplish the skills he would need in order to provide safety and permanency to his children." *Id*. at 79. Similar to Mr. Flanagan and Ms. Southerland, Dr. Williams also noted Father's lack of understanding related to the Children's abuse and his role. *Id*. at 70. Again, she references that Father was not able to recognize that he could have done things differently. *Id*. In addition, Dr. Williams stated, "[Father]'s presentation was somewhat disconnected. He was able to identify an awareness to some extent of keeping the children safe, but when he could identify an awareness he could not provide execution of the skills necessary. And in other areas he simply did not have an awareness." *Id*. at 70. She further explained:

> [Father] wasn't able to affect their safety. He had limited knowledge or if he did have knowledge, he did not follow through. And then there were multiple areas that without coaching he simply didn't understand.
>
> And, my understanding is these things continue to be an issue even beyond being coached. So even with that immediate help, which a parent not involved in DHS caring for the children fulltime does not have somebody checking behind them making sure that they're meeting the daily needs of the children. That [Father] is not able to do these things. And not to be able to provide that daily safety or even to have an intent to care for the children when brought into their care.
>
> And then, additionally, he has other children he spoke about obtaining full custody of, he was not able to explain why the mother lost custody or why he was granted full custody. And he also did not have that child with him because the mother had absconded with the child and kidnapped her. And his response to

- 19 -

that he believed she was in Washington. There was not, "My child who I've been granted full custody of is now with a woman who lost custody of her and perhaps I should pursue that. Perhaps I should look for this child and ensure their safety."

So there's just this consistent pattern of a disconnect between what a child needs to safe and his role in actually affecting that safety.

*Id*. at 72-73. Dr. Williams likewise noted a pattern of transience with Father, which influenced the Children's safety. *Id*. at 74. Significantly, despite intervention and recommendations to assist Father, Dr. Williams recognized a lack of progress. *Id*. at 75.

As this Court has stated, "[A] child's life cannot be held in abeyance while a parent attempts to attain the maturity necessary to assume parenting responsibilities. The court cannot and will not subordinate indefinitely a child's need for permanence and stability to a parent's claims of progress and hope for the future." *In re Adoption of R.J.S.*, 901 A.2d 502, 513 (Pa.Super. 2006). Hence, the record substantiates the conclusion that Father's repeated and continued incapacity, abuse, neglect, or refusal has caused Children to be without essential parental control or subsistence necessary for their physical and mental well-being. *See In re Adoption of M.E.P.*, 825 A.2d at 1272. Moreover, Father cannot or will not remedy this situation. *See id*. As noted above, in order to affirm a termination of parental rights, we need only agree with the trial court as to any one subsection of Section 2511(a) before assessing the determination under Section 2511(b). *In re B.L.W.*, 843 A.2d at 384.

We next determine whether termination was proper under Section 2511(b). Our Supreme Court has stated as follows:

> [I]f the grounds for termination under subsection (a) are met, a court "shall give primary consideration to the developmental, physical and emotional needs and welfare of the child." 23 Pa.C.S.[A.] § 2511(b). The emotional needs and welfare of the child have been properly interpreted to include "[i]ntangibles such as love, comfort, security, and stability." *In re K.M.*, 53 A.3d 781, 791 (Pa.Super. 2012). In *In re E.M. [a/k/a E.W.C. & L.M. a/k/a L.C., Jr.]*, [533 Pa. 115, 123, 620 A.2d 481, 485 (1993)], this Court held that the determination of the child's "needs and welfare" requires consideration of the emotional bonds between the parent and child. The "utmost attention" should be paid to discerning the effect on the child of permanently severing the parental bond. *In re K.M.*, 53 A.3d at 791. However, as discussed below, evaluation of a child's bonds is not always an easy task.

*In re T.S.M.*, 620 Pa. at 628-29, 71 A.3d at 267. "In cases where there is no evidence of any bond between the parent and child, it is reasonable to infer that no bond exists. The extent of any bond analysis, therefore, necessarily depends on the circumstances of the particular case." *In re K.Z.S.*, 946 A.2d 753, 762-63 (Pa.Super. 2008) (citation omitted).

When evaluating a parental bond, "[T]he court is not required to use expert testimony. Social workers and caseworkers can offer evaluations as well. Additionally, Section 2511(b) does not require a formal bonding evaluation." *In re Z.P.*, 994 A.2d 1108, 1121 (Pa.Super. 2010) (internal citations omitted).

Moreover,

> While a parent's emotional bond with his or her child is a major aspect of the subsection 2511(b) best-interest analysis, it is

nonetheless only one of many factors to be considered by the court when determining what is in the best interest of the child.

> [I]n addition to a bond examination, the trial court can equally emphasize the safety needs of the child, and should also consider the intangibles, such as the love, comfort, security, and stability the child might have with the foster parent. . . .

*In re Adoption of C.D.R.*, 111 A.3d at 1219 (quoting *In re N.A.M.*, 33 A.3d 95, 103 (Pa.Super. 2011)) (quotation marks and citations omitted).

In the case *sub judice*, in determining that termination of Father's parental rights favors the Children's needs and welfare under Section 2511(b) of the Adoption Act, the trial court stated as follows:

> Father alleges the [t]rial [c]ourt erred in terminating Father's parental rights because DHS did not meet its burden by clear and convincing evidence of showing the best interest of the [c]hild would be served by terminating Father's rights. This [c]ourt disagrees.
>
> The [c]ase [m]anager, Michael Flanagan, presented credible and convincing testimony regarding the lack of a parental bond between the Father and the Children, and opined it would be in the best interest of the Children to terminate Father's parental rights. He provided testimony of a loving bond that exists between the Children and their [m]aternal [g]randmother, who look to her for safety, care, and for all their needs.
>
> . . .

T.C.O. at 27.

Upon review, we again discern no abuse of discretion. The record supports the trial court's finding that the Children's developmental, physical and emotional needs and welfare favor termination of Father's parental rights pursuant to Section 2511(b). There was sufficient evidence to allow the trial court to make a determination of the Children's needs and welfare, and as to

the lack of a bond between Father and the Children such that, if severed, would not have a detrimental impact on them.

We first reiterate the safety and permanency concerns addressed above and Father's inability to adequately provide for the Children's safety and stability. We further note that CUA case manager, Michael Flanagan testified that Z.V.G. does not feel safe alone with Father. N.T. at 42-43. This was confirmed by Z.V.G.'s trauma therapist, Feebee Southerland. *Id*. at 53-54.

Moreover, Mr. Flanagan testified that he does not believe a parent-child bond exists between Father and the Children. N.T. at 34. When asked to explain, he stated, "I don't believe they look to him for safety. And, again, for their needs. I think that they get along well during visits and I think they do look forward to seeing him, but I don't see that parent bond." *Id*. Describing the relationship more like that of an uncle, Mr. Flanagan further indicated, "In my opinion it's more like that of an uncle is the bond. He has fun with them, but I don't see it beyond that. And I don't think they look to him for anything beyond that." *Id*. at 39. As such, Mr. Flanagan opined that the Children would not experience irreparable harm if Father's parental rights were terminated. *Id*. at 34.

Instead, noting that the Children have been in kinship care with their maternal grandmother, to whom they look for their needs and with whom they are "thriving," since being placed in March of 2015, Mr. Flanagan asserted that it is in the Children's best interests to be adopted. *Id*. at 14, 23, 35-37. Mr. Flanagan expressed, "I think for their therapeutic needs to be met as well as

all the special needs that they do have and permanency for them they need to be with their grandmother. And their overall safety." *Id*. at 37. Ms. Southerland, likewise confirmed a strong bond between the maternal grandmother and Z.V.G., and that Z.V.G. feels safest with the maternal grandmother. *Id*. at 54-56. G.L.G.'s trauma therapist, April Winand, also confirmed a strong bond between G.L.G. and the maternal grandmother and that the maternal grandmother meets the traits of an appropriate caregiver. *Id*. at 64. Notably, Mr. Flanagan additionally suggested a negative impact upon the Children if they were separated from their half-sibling, S.C., who has also been placed with the maternal grandmother. *Id*. at 37.

Thus, as confirmed by the record, termination of Father's parental rights serves the Children's developmental, physical and emotional needs and welfare and was proper pursuant to Section 2511(b). While Father may profess to love the Children, a parent's own feelings of love and affection for a child, alone, will not preclude termination of parental rights. *In re Z.P.*, 994 A.2d at 1121. At the time of the hearing, the Children had already been in care almost two and a half years, and are entitled permanency and stability. As we stated, a child's life "simply cannot be put on hold in the hope that [a parent] will summon the ability to handle the responsibilities of parenting." *Id*. at 1125. Rather, "a parent's basic constitutional right to the custody and rearing of his child is converted, upon the failure to fulfill his or her parental duties, to the child's right to have proper parenting and fulfillment of his or

her potential in a permanent, healthy, safe environment." ***In re B., N.M.***, 856 A.2d 847, 856 (Pa.Super. 2004) (citation omitted).

Based on the foregoing analysis of the trial court's termination of Father's parental rights, we agree with counsel for Father that the within appeal is wholly frivolous. As such, we affirm the orders of the trial court, and grant counsel's petition to withdraw.

Orders affirmed. Petition to withdraw granted.

Judge Dubow did not participate in the consideration or decision of this case.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 4/2/2018